Hope v. Stone et al.

------

WILLIAM HOPE vs. PHILO STONE and wife, H. S. ALLEN et al.

S. executed a quit-claim deed running to A. of certain land on the Half Breed Reservation. At the time of executing such deed the title of the land was in the United States, subject to a usufruct by the half breeds of the Sioux nation. The deed contained a covenant by which S. bound himself, when he should acquire title from the United States, to make such further or other conveyance of the premises to A., his heirs or assigns, as should be valid and effectual to convey the premises, &c. Subsequently, S. acquired title from C., who acquired it from the United States. Afterwards by a full covenant warranty deed, S.

conveyed to H. all his "right, title, interest, estate, property, possession, claim or demand whatever to said premises." · *Held*—that the quit-claim deed and cov-enant were not illegal ; that when S. acquired the title he held it in trust for the performance of his covenant, and that H. took it subject to the same trust.

This action was· brought to determine the title to certain lands in Wabashaw county, being a portion of the Half Breed Reservation. The action was tried at the December Term, 1863, of the District Court in said county by the Court without a jury. The material facts as they appear in the case and as found upon such trial, are substantially as follows : Prior to the 20th of August, 1853, one Jenny Cratt, who was a half breed or mixed blood of the Sioux nation, and a beneficiary under the treaties and acts of Congress, by which the said Reservation was set apart and disposed of, with her husband, Oliver Cratt, were in possession of the premises described in the complaint, claiming the same as their property. Prior to said 20th of August, Cratt and wife conveyed the premises by quit-claim deed, containing covenants of further assurance to the defendant, Philo Stone, and also executed a bond agreeing and covenanting at a then future day to convey said premises to said Stone, and Stone entered into possession of the premises. On the 20th of August, 1853, Stone and wife conveyed the premises to the defendant, H. S. Allen, by a quit-claim deed, which was duly recorded on the 1st day of January, 1854, and Allen took possession. On the 6th day of March, 1855, said Stone and wife executed another quit-claim deed to said Allen, conveying the same premises, which was duly recorded the same day. The last mentioned deed was executed to cure a supposed defect in the description of the premises mentioned in the former deed. The two deeds are substantially alike, containing the same covenants, except that the second contains a covenant of non-claim which is not in the first. The other covenants are as follows, viz : "And the said parties of the first part, have covenanted and agreed to and with the said party of the second part, that whenever they or either of them, or their or either of their heirs or assigns, shall hereafter acquire from the United States, the title to any land which shall include the above described premises, he or they shall

and will stand seized and possessed of such title of the above described premises, to and for the use of said party of the second part, his heirs and assigns, and not otherwise, and that when all, any or either of the said parties of the first part, shall have thus acquired the said title, he or they shall on demand make such further or other conveyance of the said premises to the said party of the second part, his heirs or assigns, as shall be valid and effectual to convey the said premises to him or them, and to extinguish such use or trust." There is a slight difference in the phraseology of the deeds in respect to the covenant of further assurance, which is commented upon in the opinion of the Court. The titles, claims, liens and interests of the defendants respectively, other than Allen and Stone, are specifically found and set out by the Court below, and were acquired either directly from Allen, or through intermediate conveyances, &c., subsequent to the delivery and recording of the deeds from Stone and wife to Allen, and prior to the 1st day of March, 1862. In April, 1857, Jenny Cratt acquired the title in fee to the land in question from the United States, and on the 11th day of July, 1857, she and her husband conveyed the same to Stone by a warranty deed, which was duly recorded on the 13th July, 1857. On the 1st day of March, 1862, the defendant Stone and his wife, by a "full covenant warranty deed," conveyed to Hope, the plaintiff, "*all their and each of their right, title, interest, property, possession, claim or demand whatsoever to said premises,*" and said deed was duly recorded the same day. The plaintiff claims title to the premises under said last mentioned deed. The plaintiff had no actual notice of the existence of the two quit-claim deeds from Stone and wife to Allen, or of the claims or interests of the defendants, or any or either of them, until the service of the answer in the action. The plaintiff has never been in the actual possession of the premises, and neither of the parties to the action had such possession at the time of the execution and delivery of the deed from Stone and wife to the plaintiff; but one Robinson was in the actual possession, under the following circumstances: The Chippeway Falls Lumbering Company (one of the

defendants,) had rented the premises to one Eddy, who without the consent of his landlord gave the key to the building thereon to said Stone, and Stone without the assent of the adverse claimants rented the premises to said Robinson, who took possession of the same under an agreement that the rent should be paid to the party in whom the Court should adjudge the title to be vested, at the time of the execution and delivery of the deed from Stone and wife to the plaintiff, and still remains in such possession.

The conclusions of law as found and decided by the Court below are substantially as follows : The recording of the two quit-claim deeds from Stone to Allen, would not be constructive notice to the plaintiff, the grantor having no title to the premises when the same were executed. The possession of Robinson would not be constructive notice to plaintiff of any rights or interests of Allen or his assigns in the premises ; such possession being that of a tenant, was not notice of the title of his lessor. The covenant of Stone to stand seized of the premises to the use of Allen and his heirs, &c., would not be effectual, except upon the contingency that Stone should acquire the title from the United States and not otherwise. Allen never had any interest in the premises, to which a judgment lien would attach. The plaintiff is a bona fide purchaser of said premises, without either actual or constructive notice of any rights or interests claimed by any of the defendants, and the title in fee simple is vested in the plaintiff; and the defendants, or either of them, have no valid claim or interest in said premises as against the plaintiff's title, and the respective interests claimed by defendants are adverse to the title of the plaintiff, and a cloud upon the same and should be removed.

Judgment was entered in favor of the plaintiff, pursuant to such finding and decision ; the defendants appeal to this Court.

S. L. CAMPBELL and WILDER & WILLISTON for Appellants.

I.—The plaintiff not being in possession of the premises in question, this action cannot be maintained, and should have been

dismissed by the Court below. The complaint does not pretend to set forth the nature or character of the defendants' claim to the property, but simply avers the plaintiff's title and possession, and that defendants claim some interest adverse to the plaintiff. The defendants deny that possession, and the Court finds that the plaintiff is not and never has been in possession of the property. We claim this to be an action under the statute. *Comp. Stat., p.* 595, *sec.* 1; 2 *Minn. R.*, 153; 5 *Id.*, 223; 6 *Id.*, 179; 7 *Id.*, 167; 8 *Id.*, 403.

[NOTE.—After the cause was submitted, the foregoing point was waived in writing by counsel for appellant.—REPORTER.]

II.—The Court erred in holding the plaintiff to be a bona fide purchaser without notice.

III.—The Court erred in holding the records of the deeds from Stone and wife to Allen, and of the deed from Allen and others to the Chippewa Falls Lumbering Company, and of the mortgage from the latter to McKittrick & Branch, and the judgments, &c., against the Chippewa Falls Lumbering Company, were not notice to the plaintiff. These deeds were not outside of but within the chain of title. Stone, the grantor, was also the grantor of the plaintiff. *Parkist vs. Alexander et al.*, 1 *John. Ch. R.*, *p.* 394; *Comp. Stat. p.* 405–6.

IV.—The Court erred in holding the possession of Robinson was not notice to the plaintiff, or at least that it was insufficient to put the plaintiff upon inquiry.

V.—The Court erred in holding the covenants to stand seized, &c., contained in the deeds from Stone and wife to Allen, were inoperative, and insufficient to make Stone, when he obtained the title, the trustee of Allen and of his grantees. It is immaterial whether Stone derived title mediately or immediately from the United States.

VI.—There was nothing in the deeds or in the arrangement between the parties against the policy of the law or against public policy. They did not convey or assume to convey the land, but only the possession, in connection with the covenants to stand

seized, &c., and for farther assurance of title if the same should be obtained.

W. W. PHELPS and WARREN BRISTOL for Respondent.

I.—a. This is an equitable action and can be maintained under the well established rules of equity jurisprudence. *Story Eq. Juris.*, 2 *Vol.*, sec. 700, *et seq.*; *Hamilton vs. Butler*, 7 *Minn.*, 167; 8 *Minn.*, 403.

b. The pleadings show this to be an equity action.

c. Ejectment could not establish the rights of the parties, because the possession of Robinson, who held as tenant of respondent's grantor, is not adverse or against respondent.

II.—a. This action is within the statute. Respondent is the owner of the land in dispute in fee simple absolute, deriving title in a direct line from the government of the United States, which in the absence of an adverse possession confers the legal possession upon him. *Revised Stat.*, p. 595, sec. 1; *Id.*, 378, sec. 8; 4 *Kent*, 483–4; 5 *Pick.*, 135; 11 *Id.*, 1.

b. Robinson by operation of law became Hope's tenant. *Smith's Leading Cases*, 315; 3 *Pick.*, 154.

c. Possession of tenant, possession of the landlord, and he may, though not himself in actual possession, commence this action. 2 *Bouvier*, 352; *Rev. Stat.*, 595.

III.—a. In this State the record of a deed is not made notice, constructive or otherwise, of its contents.

b. The effect of a record under our statute is simply to perfect the grant. A subsequent recorded deed has precedence and priority to a prior unrecorded deed; and such subsequent deed to a grantee without notice passes the title. This being the effect of registration, the statute is properly silent as to notice. The record simply shows in whom the title of estates vests.

c. The records of the deeds and mortgage, and the docketing of the judgments in this case prior to the entry of the land, are not notice of themselves to those within the chain of title after such entry.

*d.* In investigating this title Hope was not required to go behind the primary grant of the land by the United States.

*e.* The registration of an unauthorized or illegal instrument, or one that is a nullity, is neither effective for any purpose, or notice. *Story Eq. Jur.*, 404; 8 *Paige*, 361; 3 *Ch. Dig.*, 132; 6 *Minn.*, *Baze vs. Arper*, 220; 6 *Minn., Thompson vs. Morgan*, 292; 2 *Watts*, 75.

IV.—*a.* The deeds under which the appellants claim, create at most only an equitable interest in them, and Hope, taking his deed without notice of such equity, holds the land discharged of it. 8 *Paige*, 361.

*b.* Such a deed is not notice to subsequent purchasers. 3 *Ch. Dig.*, sec. 17, *p.* 132.

V.—The land being Indian lands at the time of the pretended conveyance of Stone to Allen, the same was not conveyed thereby. The deed was a nullity. 8 *Wheat.*, 673; 6 *Cranch*, 87; 13 *Pet.*, 195; 6 *Id.*, 557.

VI.—*a.* The deeds from Stone to Allen were illegal and void as against public policy and the laws. *U. S. Stat. at Large, Vol.* 4, *p.* 730; 6 *Peters*, 557.

*b.* A contract may be illegal without contravening any specific statute, provided it is opposed to the general policy and intent thereof. *Chit. on Con.*, sec. 602; 3 *Cush.*, 419; 14 *How.* (*U. S.*) *Rep.*, 449.

VII.—*a.* If the deeds were void, the covenant to stand seized is void also, as tainted with the same illegality. What may not be done directly may not be done indirectly.

*b.* A covenant to stand seized in no way affects Hope. At best it created but an equity, of which he had no notice, and of and from which he is discharged.

*c.* If such covenant amounts to anything it is a personal covenant from Stone to Allen, which Allen did not and could not assign by deed conveying land, as it did not run with the land, for the deed did not operate upon or effect land.

*By the Court*—BERRY, J.—The land in controversy in this

action is a part of what is commonly known as the Half Breed Reservation lying on the right bank of the Mississippi River and in the vicinity of Lake Pepin. Jenny Cratt was a half breed or mixed blood of the Sioux nation, and a beneficiary under the treaties and acts of Congress by which the Reservation was set apart and disposed of. All the parties to this suit except Madeline Stone are white persons. During a period of time prior to August 20, 1853, Jenny Cratt and her husband Oliver Cratt, had been in the sole and exclusive possession of the premises in litigation, claiming the same as their property, and prior to said 20th day of August, they quit-claimed the same to Philo Stone, with covenants for further assurance, and also executed a bond running to said Stone, in which they covenanted to convey the said premises to him at a future day. Thereupon Cratt and his wife surrendered the sole and exclusive possession of the premises to Stone, by whom it was retained until the 20th day of August, 1853, when he and his wife quit-claimed the property to H. S. Allen, with covenants to stand seized, and for further assurance. On the 6th day of March, 1855, some doubts being entertained as to the sufficiency of the description of the land in the first deed from Stone to Allen, Stone and his wife executed another quit-claim deed in favor of Allen, which contained covenants of non-claim for further assurance and to stand seized. The premises described in each of the deeds from Stone to Allen are found by the Court below to be the same premises to which this action relates. The other defendants all claim under Allen, either directly or through intermediate conveyances, by a variety of titles and liens, all subsequent in their inception to the delivery and registration of the deeds from Stone to Allen, and prior to the deed from Stone to Hope. In April, 1857, Jenny Cratt entered a tract of land, comprising the land which is the subject of this action, at the Red Wing Land Office, in conformity to the laws and treaties relating to said Reservation. This is the beginning of the title in fee from the United States. On the 11th day of July, 1857, she and her husband by a warranty deed conveyed to Philo Stone " all their and each of their right, title, interest, property, possession, claim and demand

*whatever, of in and to*" the premises in controversy, and the deed was duly recorded. On the 1st of March, 1862, Stone and his wife by a "full covenant warranty deed," (as is found below), conveyed to William Hope, the plaintiff and respondent, "*all their and each of their right, title, interest, estate, property, possession, claim or demand whatsoever to said premises,*" and this deed was also duly recorded. Here it is proper, though perhaps not very important, to say that a preliminary question was raised as to whether the plaintiff had shown himself to be in possession, and so entitled to maintain this action to determine an adverse claim under the statute, but whatever there is in the point is waived in writing and taken out of the case. Such a practice seems to be sometimes allowed. *Whitten vs. Whitten,* 3 *Cush.,* 195.

To return, there can be no question but that the deed from Cratt and wife, bearing date July 11, 1857, passed the legal estate in fee simple absolute to Stone. And the inquiry upon the answer to which this case may properly turn, is whether Stone then held the title subject to any valid legal or equitable rights on the part of Allen, or of his representatives in interest, under the quit-claim deeds executed by Stone to Allen in 1853 and 1855, or the covenants therein contained. It will be recollected that Stone executed two quit-claim deeds in favor of Allen, the latter of which was intended to correct an apprehended insufficiency of the description of the land in the first deed. In our view it is unnecessary to inquire whether the first description was sufficient or not. If it was, then the second deed was superfluous for the purpose for which it was intended, and if it was not then the defect was cured by the second deed. No rights accrued to third persons intervening the deliveries of the two instruments. Aside from the description the principal difference which we observe is that the second deed contains a covenant of non-claim which is not found in the first. But so far as this covenant is concerned, the weight of authority would seem to be that in a case like this it would only relate to the estate, right or interest actually conveyed by the quit-claim deed, and would not preclude the covenantor from setting up in his own favor, and against the covenantee, any after

vol. x.—20

acquired estate or interest. *See* 2 *Washburn Real Prop.*, 465, 496–7, 665, *and cases cited; Miller vs. Ewing*, 6 *Cush.*, 34. The other covenants are as follows : "And the said parties of the first part have covenanted and agreed, and do hereby covenant and agree, to and with the said party of the second part, that whenever they or either of them, or either of their heirs or assigns, shall hereafter acquire from the United States the title to any land which shall include the above described premises, he or they shall and will stand seized and possessed of such title of the above described premises to and for the use of said party of the second part, his heirs and assigns, and not otherwise, and that when all, any or either of the said parties of the first part shall have thus acquired the said title, he or they shall, on demand, make such further or other conveyance of the said premises to the said party of the second part, his heirs or assigns, as shall be valid and effectual to convey the said premises to him or them, and to extinguish such use and trust." The covenant to stand seized, it would seem, can only be supported as such when based upon a consideration of blood or marriage, neither of which appears in this case. 4 *Kent Com.*, 493. It is a principle of law "that if the form of the conveyance be an inadequate mode of giving effect to .the intention according to the letter of the instrument, it is to be construed under the assumption of another character so as to give it effect." *Ibid.* And so, a covenant to stand seized is sometimes held good as a grant. But the invoking of that principle would not help this case, for at the time he entered into the covenant to stand seized, Stone had nothing to grant, and clearly, in the absence of a covenant of warranty, nothing would pass by his grant. But we can conceive of no reason why the covenant for further assurance was not binding upon Stone, his heirs and assigns, according to its purport. There is, to be sure, a difference between the language of the first and second deeds as to the contingency upon which the obligation to make further assurance was to become operative. In the first, Stone agrees to make · further assurance when he, his heirs, &c., " shall hereafter acquire from the United States *or otherwise*, the fee simple, title,"_&c. In the second deed

the words "*or otherwise*" are omitted.   We think the difference is verbal and not substantial, and that it was immaterial whether Stone acquired title mediately or immediately from the United States.   If the words "*or otherwise*," were as we think superfluous, then their omission from the second deed would have no effect.   And any inference which might be drawn from the fact of this omission that the covenantors intended to vary their liability as expressed in the first deed, is repelled by the stipulation of the parties upon which the Court find that the second deed was "executed and delivered on account of doubts having arisen in respect to the *sufficiency of the description*" in the first deed.

This view would appear to be strengthened by the fact as found below, that Stone originally acquired his possession and claim of right under a quit-claim deed from Cratt and his wife, which contained *a covenant for further assurance*, and under a bond for a conveyance *at a future day* executed by the same parties.   Taken in connection with other facts of the case, we think this has a tendency to show that the understanding and expectation was that Stone would acquire title from the United States *indirectly*, as he did.

Whether Stone derived his title from the United States directly or through mesne conveyance, we think he held it in trust for Allen, or his representative in interest.   For it is obvious on general principles, and well settled by authority, that where a covenant for further assurance exists, the covenantee has the right to invoke the aid of a court of equity to compel a specific performance of the covenant.   2 *Sug. Vend.*, 541; 2 *Wash. R. P.*, 667; *Rawle on Cov.*, (2d *Ed.*,) 208; *Colby vs. Osgood*, 20 *Barb.* (*S. C.*) *R.*; 339.   *See also Fitch vs. Fitch*, 8 *Pick.*, 482.   A vendor who has received the purchase money but has not conveyed, is a trustee of an implied trust.   2 *St. Eq. Jur.*, 789.   A covenant for further assurance would place the covenantor in a similar relation to the covenantee.   And in the particular case before us the covenant would seem to be in substance the same as a contract of sale.   For upon the face of the instrument in which the covenant is found, it appears that at the time of its execution the covenantor, Stone,

had no title to the premises, and by his covenant he agrees to make title when acquired to the covenantee. Under the deed of March 1st, 1862, Hope acquired the *right, title and interest* of Stone, and nothing more, for that is all which is attempted to be transferred by the terms of the conveyance. This right, title and interest, as we have endeavored to show, was the fee, subject to the trust, created in favor of Allen by the quit-claim deed and the covenants, therein, and Hope took the title subject to the same trusts. 20 *Pick. R.,* 458; 12 *Met.,* 177; 14 *N. H.,* 226; 3 *Wheat.,* 452; *Adams vs. Cuddy,* 13 *Pick.,* 463; 12 *Pick.,* 66; 4 *Pick.,* 464; 13 *Pick.,* 116, 119, 120; 5 *Gray,* 528; 2 *Story Eq. Jur.,* 784; *Rawle on Cov.,* 420–2 *and notes.* And in this view of the matter it is entirely unimportant what was the effect of the registration of the quit-claim deeds from Stone to Allen prior to the acquisition of any title from the United States, and it is equally immaterial what was the effect of the possession of Robinson. For the only light in which either the possession or registration could be contended to be important would be as notice of the rights of Allen or his representatives in interest. And if the deed from Stone to Hope had been a conveyance of the land, instead of Stone's right, title and interest, then it might be necessary to inquire whether the registration or possession were notice to Hope of rights in third parties antecedent and adverse to his own. But as he took by the deed from Stone only Stone's right, he of course took nothing legal or equitable which Stone had previously transferred to Allen. *See authorities above cited.* So that the question of notice is out of the case, or as might be said, the terms of the deed itself were notice to him of the existence of any and all rights which had previously been conferred by Stone upon any and every other person. But it is objected that the deed from Stone to Allen was illegal and void as against public policy and the law. It is not claimed that there is any statute specifically prohibiting such transactions, or by which they are expressly declared to be void. There would appear to be no illegality in an agreement to convey lands when title should be acquired, although at the time of executing such agreement the title

is in the United States. *See Fackler vs. Ford*, 24 *How. U. S. R.*, 323; 1 *Mor. (Iowa) R.*, 367, 275. But the statute to which our attention is called in support of the objection of illegality, is "an act to regulate trade and intercourse with the Indian tribes," &c., passed in 1834, and found in 4 *U. S. St. at Large*, 730. Even if that act be applicable to the Reservation, which is by no means clear, we are unable to perceive how the deed from Stone to Allen can be regarded as contravening it in letter or in spirit. By section 11 of the act a penalty is imposed upon any person making a settlement or survey, or designating any of the boundaries by marking trees, &c., on any lands belonging, secured or granted by treaty with the United States *to any Indian tribe*, but there is nothing in this case to show that Stone, Allen, or any of Allen's successors in interest, had done anything to subject themselves to such penalty. Section 12 provides that no purchase, grant, lease or other conveyance of lands, or of any title or claim thereto from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless it be made by treaty or convention entered into pursuant to the constitution; and a penalty is imposed upon any person who shall without authority attempt to negotiate such treaty or convention, or to treat with any nation or tribe of Indians for the title or purchase of land by them held or claimed. Even if this provision be applicable to the half breeds and the Reservation, we can see nothing in the deed from Stone to Allen violative of the law. The facts here present a case of quit-claim deeds which probably conveyed nothing because the grantor had nothing to convey, the title being in the United States subject to a usufruct by the half breeds. Certainly there was nothing illegal or against public policy in the execution of these deeds. But further, the deeds contained a covenant by the releasor to make such further or other conveyance as shall be valid and effectual to convey the premises when he shall have acquired title from the United States. There could be nothing wrong in this. We think the covenant was valid and binding in Stone; that when Stone acquired the title he held the land in trust for the performance of

his covenant, and for the reason before given that Hope took it subject to the same trust.

The judgment below is reversed, and the action remanded for further proceedings.

[Wilson, Ch. J., dissented, but filed no opinion.]